UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | Bankruptcy No. 03 B 14250 |
| ) | Chapter 7 |
| JAMES CHRISTOPHER SZABO, ) | Judge John H. Squires |
| ) | |
| Debtor. ) | |
| ) | |
| DAVID R. BROWN, Trustee for the ) | Adv. No. 04 A 03446 |
| Bankruptcy Estate of James Christopher ) | |
| Szabo, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FRANK SZABO, JR., ) | |
| INFRASTRUCTURE CONSTRUCTION ) | |
| SERVICES, LLC, an Illinois Limited ) | |
| Liability Company, and ) | |
| INFRASTRUCTURE CONSTRUCTION ) | |
| SERVICES, INC., an Illinois corporation, ) | |
| ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the motion of David R. Brown, the Chapter 7 trustee ("Trustee") of the estate of James Christopher Szabo, to enforce the judgment and imposition of a resulting trust on the assets in the hands of Carol Szabo, Metrikis Properties, LLC, and other punitive relief. For the reasons set forth herein, the Court grants the Trustee's motion to enforce the judgment and for the imposition of a resulting trust pursuant to 735 ILL. COMP. STAT. 5/2-1402, Rule 7069 of the Federal Rules of Bankruptcy Procedure,

and Rule 69(a) of the Federal Rules of Civil Procedure. A resulting trust in one-half of property located in Addison, Illinois arose in favor of Frank Szabo, Jr. and is subject to the enforcement of the judgment.

### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

### II. FACTS AND BACKGROUND

Frank Szabo was the owner of Szabo Contracting, which was in the business of installing sewer systems for municipalities. (Pl. Ex. No. 3 at 7.) Frank Szabo is the father of James Szabo and Carl Szabo. (*Id.*)

On May 9, 1999, Mountbatten Surety Company ("Mountbatten"), filed suit in DuPage County, Illinois against Szabo Contracting, Frank, James, Carl, and Carla Szabo, Frank's wife at the time. (Pl. Ex. No. 1.) On September 2, 1999, Frank and Carla obtained a dissolution of marriage, and Frank was awarded property located in Elmhurst, Illinois ("Elmhurst Property"). (*Id.*)

On October 1, 1999, James and Carl formed a limited liability company known as ICS, LLC. *Brown v. Szabo (In re Szabo)*, Bankr. No. 03 B 14242, Adv. No. 05 A 00988, 2006 WL 83408, at * 4 (Bankr. N.D. Ill. Jan. 9, 2006). Soon after the formation of ICS,

-3-

LLC, Frank was involved in the company, first as an estimator and then as general manager. (Pl. Ex. No. 3 at 9-10.)

In December 1999, an involuntary bankruptcy petition was filed against Szabo Contracting. (Pl. Ex. Nos. 1 & 3 at 7.) In November 2000, after several motions had been filed in the Szabo Contracting bankruptcy case, Frank provided Carla a quit claim deed conveying the Elmhurst Property to her. (Pl. Ex. No. 5 at 116.) Carla was unaware of the transfer and, although Frank continued to live on the Property, Carla received no rent from Frank. (Trustee Citation Designation C at 10-14; Pl. Ex. No. 5 at 120.)

On August 6, 2001, Frank filed a Chapter 7 bankruptcy petition. (Pl. Ex. Nos. 1 & 3 at 4.) Frank did not list the Elmhurst Property on his bankruptcy schedules. (Frank Szabo Bankr. No. 01 B 27820, Schedule A, Docket No. 8.) On September 1, 2001, Frank married Carol Szabo[1] and a pre-nuptial agreement between Frank and Carol was signed.[2] (Pl. Ex. Nos. 1, 2 at 7 & 10, 4 at 57; Def. Ex. No. 1.)

In January 2002, while Frank was still in bankruptcy, Frank forged Carla's signature on a quit claim deed conveying the Elmhurst Property to Carol. (Pl. Ex. Nos. 2 at 22 & 5 at 127; Trustee Designation C at 17.) The deed was made out to Carol's maiden name, Metric, and was sent to her parents' address in Wheaton, Illinois. (Pl. Ex. No. 2 at 22.) Carla was unaware that the Elmhurst Property was in her name, she never transferred the Property to

---

[1] Carol was also known as Carol Lese and Carol Metric, her maiden name. (Pl. Ex. No. 2 at 6 & 27.)

[2] There is contradicting testimony regarding the pre-nuptial agreement. Frank testified that it was signed after the marriage. Carol testified that it was signed prior to the marriage. The actual pre-nuptial agreement is dated August 26, 2001. (Pl. Ex. Nos. 2 at 10 & 4 at 57; Def. Ex. No. 1.)

-4-

Carol, and she did not authorize Frank to sign her name on the deed. (Trustee Designation C at 17 & 19.)

On February 12, 2002, Frank and Carol obtained a $200,000 revolving line of credit from Oxford Bank which was secured by a mortgage on property located in Naperville, Illinois ("Naperville Property"). (Pl. Ex. Nos. 1, 2 at 45-46, & 4 at 16.) The line of credit was to be used for investing in ICS, LLC or purchasing real estate. (Pl. Ex. Nos. 2 at 57 & 4 at 15.)

On February 14, 2002, Carol and Frank sold the Elmhurst Property. (Pl. Ex. Nos. 1 & 2 at 29-30.) The sale price was $475,000 and net proceeds of $223,525 were deposited into Frank's account at Oxford Bank. (*Id.*) The proceeds of the sale were the property of Frank alone. (Pl. Ex. No. 2 at 37-39.)

On February 19, 2002, Frank and Carol purchased a home in Florida ("Florida Property") for $429,000. (Pl. Ex. Nos. 1, 2 at 30, & 5 at 137.) The warranty deed was executed and recorded in both Frank and Carol's name. (Pl. Ex. Nos. 1, 2 at 41, & 5 at 144.) $223,525 of the purchase price came from Frank's account at Oxford Bank, $200,000 came from the revolving line of credit at Oxford Bank, and the remaining money came from Carol in cash. (Pl. Ex. Nos. 1, 2 at 45-46, & 5 at 142-143.) On March 6, 2002, Frank was discharged from bankruptcy. (Frank Szabo Bankr. No. 01 B 27820, Docket No. 28.)

In April 2002, Frank and Carol obtained a loan for $215,000 from Charter One Bank secured by a mortgage on the Florida Property. (Pl. Ex. Nos. 1, 2 at 48, & 5 at 143.) The proceeds of the loan were used to pay off the revolving line of credit at Oxford Bank and loan closing costs. (Pl. Ex. No. 1; Def. Mem. Opp. 4.) Around this time, Carol transferred

-5-

Frank's outstanding credit card balance of $13,400 to her credit card account. (Def. Mem. Opp. 4; Pl. Ex. No. 5 at 106.)

In October 2002, Carol and Frank refinanced the original mortgage loan on the Naperville Property in the amount of $149,000. (Pl. Ex. Nos. 1 & 2 at 62-63.) A quit claim deed on the Naperville Property was executed listing Frank and Carol as joint tenants.[3] (*Id.*)

On October 31, 2002, a judgment was entered in Mountbatten's favor and against Carl and James in the amount of $763,544.31. (Pl. Ex. No. 1; J. Order ¶ 9, Docket No. 49.) After the judgment was entered, Frank agreed to acquire ICS, LLC from Carl and James for $500 each.[4] (J. Order ¶ 11.) On November 21, 2002, Frank executed a quit claim deed conveying his interest in the Naperville Property back to Carol.[5] (Pl. Ex. Nos. 1[6] & 2 at 64.)

On March 7, 2003, another judgment was entered in favor of Mountbatten and against James and Carl in the amount of $592,298.46. (J. Order ¶ 9.) On March 31, 2003, James filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. (*Id.* ¶ 5.) On

---

[3] The deed was not recorded until June 27, 2003 and it was re-recorded on May 2, 2005. (Pl. Ex. No. 2 at 64.)

[4] Three documents were executed to effectuate the transfer of ICS, LLC. (J. Order ¶ 12.) An "Intent to Purchase" was dated June 8, 2002, a "Transfer of Interest" was dated June 30, 2002, and a document entitled "Additional Concideration (sic) for Transfer" was dated June 30, 2002. (*Id.*) Mr. Sykora, the accountant for ICS, LLC, testified that he drafted the first two documents, but not the third. (*Id.*) He further testified that the documents he prepared were prepared in November 2002, and that Frank requested that he "back date" the documents. (*Id.*)

[5] The deed was not recorded until January 13, 2003, and it was re-recorded on May 2, 2005. (Pl. Ex. Nos. 1 & 2 at 64.)

[6] This exhibit incorrectly references Carla instead of Carol as the recipient of Frank's interest in the Naperville Property.

-6-

the statement of financial affairs filed in his bankruptcy case, James listed the transfer to Frank of his interest in ICS, LLC in return for Frank's assumption of secured indebtedness to Oxford Bank. (*Id.* ¶ 10.) The audited financial statements of ICS, LLC show that James's and Carl's equity in ICS, LLC was $333,500 each. (*Id.* ¶ 11.)

In August 2003, Oxford Bank debited the accounts of ICS, LLC for $330,113.07 and used those funds to pay off several loans between ICS, LLC and Oxford Bank. (Pl. Ex. Nos. 1 & 4 at 6.) Frank and Carol's line of credit, secured by the Naperville Property, was not paid off. (Pl. Ex. No. 1.) Throughout 2003, Frank made draws on the line of credit to be used for ICS, LLC, increasing the balance to $125,422. (Def. Mem. Opp. 4; Pl. Ex. No. 2 at 57.)

In September 2003, Carol represented herself as owner of ICS, Inc.[7] and applied for loans from Fifth Third Bank. (Pl. Ex. Nos. 1, 2 at 70, & 4 at 10.) On September 18, 2003, Carol guaranteed an equipment loan from Fifth Third Bank to ICS, Inc. in the amount of $380,000. (Pl. Ex. Nos. 1, 2 at 80, & 4 at 11.) On October 15, 2003, Frank purportedly provided Carol a self-created pledge of personal property, listing his interest in ICS, LLC, the Naperville Property, and the Florida Property, in an attempt to secure a $135,000 loan and commercial guaranty of $380,000. (Def. Ex. No. 4.)

In April 2004, LaSalle Bank completed a foreclosure on property located in Addison, Illinois ("Addison Property"). (Pl. Ex. Nos. 1 & 2 at 80.) Frank owned the Addison Property

---

[7] Around May 2003, Frank created ICS, Inc. and was the sole shareholder. However, by August 2003, ICS, Inc. and ICS, LLC were commingled: ICS, Inc.'s receivables were deposited into ICS, LLC's account and ICS, Inc. was using the checking account of ICS, LLC. (Pl. Ex. No. 4 at 6-7.)

-7-

prior to the foreclosure and since at least 1999, Frank or his children have operated various construction operations out of the Addison Property. (Pl. Ex. No. 4 at 32; Pl. Supp. Mem. 2.)

On April, 10, 2004, Frank and Carol obtained loans from Countrywide, secured by a mortgage on the Naperville Property, in the amount of $468,700. (Pl. Ex. No. 1; Def. Mem. Opp. 4.) With the proceeds of that loan, Frank and Carol used the funds to payoff the mortgages on the Naperville Property in the amount of $140,011. (Def. Mem. Opp. 4.) The other proceeds were used to payoff $126,268 to Oxford Bank and to payoff the mortgage on the Florida Property in the amount of $200,574. (*Id.*) On September 2, 2004, the Trustee filed this adversary proceeding against Frank, ICS, LLC, and ICS, Inc. On September 28, 2004, Frank and Carol obtained a loan through Countrywide, secured by a mortgage on the Florida Property, in the amount of $503,250. (Def. Mem. Opp. 5.) The proceeds of that loan were used to purchase the Addison Property. (*Id.*) Frank, along with the seller, signed a purchase agreement for the Addison Property dated September 28, 2004, agreeing to pay the purchase price of $500,000. (Pl. Ex. No. 6.) On September 29, 2004 Frank signed a handwritten document conveying title in the Addison Property to Carol. (Pl. Ex. No. 7.) The tax bills on the Addison Property were to be sent to Frank. (Pl. Ex. No. 8.)

On October 30, 2004, a commercial lease on the Addison Property was signed by Frank for ICS, Inc. and Carol for Metrikis Properties. (Pl. Ex. No. 9.) More than a month later, in December 2004, Frank and his attorney created Metrikis Properties on behalf of Carol. (Pl. Ex. No. 12.)

-8-

On April 27, 2005, following the hearing of the adversary proceeding against Frank, ICS, LLC, and ICS, Inc., the Court entered judgment in favor of the Trustee and against Frank in the sum of $330,000 under 11 U.S.C. § 548(a)(1)(A) and (B), 11 U.S.C. § 550(a)(1), and 740 ILCS 160 of the Illinois Uniform Fraudulent Transfer Act. (J. Order at 7.) The Court also entered judgment against ICS, Inc. in the sum of $330,000. (Id.)

On May 2, 2005, five days after judgment was entered against Frank, the quit claim deeds on the Naperville Property from Carol to Frank and Carol and the quit claim deed from Frank back to Carol were re-recorded. (Pl. Ex. Nos. 1 & 2 at 64.)

On May 25, 2005, a citation to discover assets was served on Frank and Carol. (Pl. Ex. No. 1.) On May 26, 2005, one day after Frank and Carol were served, Carol transferred title to the Addison Property to Metrikis Properties. (Pl. Ex. Nos. 1 & 11.) On June 29, 2005, Frank appeared for his citation examination but Carol did not appear. (Pl. Ex. Nos. 1 & 4.)

On July 20, 2005, Carol filed a petition for dissolution of marriage against Frank (Pl. Ex. Nos. 1 & 2 at 14.) On July 22, 2005, Frank and Carol's attorney was terminated in this matter. (Pl. Ex. No. 1.) Frank did not appear for his July 29, 2005 citation because he was without counsel. (Id.) The marital dissolution proceeding was not disclosed until August 9, 2005, the day that judgment for dissolution of the marriage was entered. (Id.) Under the marital settlement agreement, Frank was required to convey his interest in the Florida Property to Carol. (Def. Ex. No. 7.) A clause within the settlement states that Carol owns the Addison Property and Frank has no interest in the Property. (Id.) On August 12, 2005,

-9-

Frank executed and recorded a quit claim deed conveying the Florida Property to Carol. (Pl. Ex. No. 1; Def. Ex. No. 8.)

On August 26, 2005, Carol first appeared for her citation examination, and on October 7, 2005, JCS, Inc., through a designated representative, appeared for its examination. (Pl. Ex. Nos. 2 & 5.)

The instant motion was filed by the Trustee on January 20, 2006. The Trustee alleges that Frank purchased the Addison Property for his own use and benefit, but that Metrikis Properties is the nominal title holder of the Property. The Trustee seeks to enforce the judgment against Frank by imposing a resulting trust on the Addison Property.

## III. **DISCUSSION**

Pursuant to Federal Rule of Bankruptcy Procedure 7068 and Rule 69(a) of the Federal Rules of Civil Procedure, the procedure for enforcing federal court judgments shall be in accordance with the practice and procedure of the state of Illinois. The relevant provisions of Illinois law, 735 ILL. COMP. STAT. 5/2-1402, allow the judgment creditor to serve a citation in order to find assets that will satisfy the judgment. Under § 5/2-1402(c) a court may compel a judgment debtor to deliver assets to satisfy the judgment or may compel any third party cited to deliver assets if the judgment debtor could recover those assets. In the context of a citation to discover assets in Illinois, the court may impose a resulting trust on assets nominally held by a third party when the judgment debtor retains the beneficial interest in

-10-

those assets. *Kaibab Indus., Inc. v. Family Ready Homes*, 444 N.E.2d 1119, 1126-27 (Ill. App. Ct. 1983).

A resulting trust is "based upon the 'natural equity' that one who pays for property should enjoy it." *In re Estate of Koch*, 697 N.E.2d 931, 933 (Ill. App. Ct. 1998). It is an "intent enforcing trust" which arises by operation of law from the presumed intent of the parties. *In re Estate of Wilson*, 410 N.E.2d 23, 23 (Ill. 1980). The presumed intent of the parties is inferred from their conduct, relationship, and surrounding circumstances. *Carlson v. Carlson*, 393 N.E.2d 643, 645 (Ill. App. Ct. 1979); *Davenport v. S.I. Sec.*, 268 B.R. 159, 162-63 (Bankr. N.D. Ill. 2001) (*citing Fender v. Yagemann*, 193 N.E.2d 794, 796 (Ill. 1963) and *Judgment Servs. Corp. v. Sullivan*, 746 N.E.2d 827, 831 (Ill. App. Ct. 2001)).

In the most common situation involving real property, the general rule is that where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person who paid the purchase price. *Carlson*, 393 N.E.2d at 645; *United States v. Marx*, 844 F.2d 1303, 1309 (7th Cir. 1988).

Under well established precedent in Illinois, a resulting trust arises and vests, if at all, at the time of conveyance. *Fender*, 193 N.E.2d at 796; *Hanley v. Hanley*, 152 N.E.2d 879, 882 (Ill. 1958). The burden of proof to establish such a trust is on the party claiming it, and the evidence must be clear and convincing; if doubtful, or susceptible to other reasonable interpretations, the evidence is insufficient to show a resulting trust. *Id*; *In re Davenport*, 268 B.R. 159, 163 (Bankr. N.D. Ill. 2001). This clear and convincing standard is a factual

-11-

determination that is to be decided by the court. *Hocking v. Hocking*, 394 N.E.2d 653, 658 (Ill. App. Ct. 1979).

Generally, it is presumed that when a husband gives title to property to his wife, the conveyance is a gift or advancement. *Judgment Servs. Corp.*, 746 N.E.2d at 831; *Coates v. Coates*, 381 N.E.2d 1200, 1203 (Ill. App. Ct. 1978). This presumption, however, may be rebutted by clear and convincing evidence. *Carlson*, 393 N.E.2d at 645. Some of the factors tending to overcome this presumption are making of improvements, payment of taxes, mortgage debt, occupancy, exercise of control of the property, and management of the property. *Coates*, 381 N.E.2d at 1204 (*citing Scanlon v. Scanlon*, 127 N.E.2d 435, 439 (Ill. 1955)). It is the province of the court to determine whether the evidence is sufficient to overcome such presumptions. *Davenport*, 268 B.R. at 163 (*citing Judgment Servs. Corp.*, 746 N.E.2d at 832). When the evidence presented is contradictory, the factual determinations necessary to decide the matter are left to the court, which has the ability to determine the witnesses' credibility. *Hocking*, 394 N.E.2d at 658.

In many cases involving a resulting trust, the property owner transferred his or her property to a family member in an effort to prevent the loss of the property. *See Carlson*, 393 N.E.2d at 645 (imposing a resulting trust where wife conveys property to husband to protect the home from being used to satisfy a judgment); *Matter of Engel*, 408 N.E.2d 1134, 1136-38 (Ill. App. Ct. 1980) (imposing a resulting trust where son holds in his bank account funds given to him by his mother while in a nursing home); *Coates*, 381 N.E.2d at 1203-04 (imposing a resulting trust where husband added wife on deed to avoid legal troubles).

-12-

The Trustee argues that the evidence in the instant matter points to the fact the Addison Property was transferred to Carol and subsequently to Metrikis Properties in order to deliberately avoid the Trustee and creditors. To support this argument, the Trustee shows that many of the actions of Frank and Carol were taken shortly after and in response to judicial proceedings.[8]

The Trustee asserts that the Addison Property was purchased by Frank and is now nominally held by Metrikis Properties for the benefit of Frank. The Trustee argues that this is evidenced by several factors and circumstances: (1) Frank signed the purchase contract and agreed to pay for the Addison Property, (2) Within a month of this adversary proceeding being filed against Frank and ICS, Frank transferred the Property to Carol, (3) Carol paid no consideration when Frank conveyed the Addison Property, (4) Frank orchestrated and paid for the creation of Metrikis Properties, (5) Title was then transferred to Metrikis Properties, five days after judgment was entered against Frank in this matter, (6) Frank or his companies paid the taxes on the Property, (7) Frank or his companies occupied the Property before foreclosure, (8) Frank or his companies continually occupied the Property after the conveyance, and (9) there is no evidence that Carol ever occupied or used the Property.

The Trustee also argues that, in an effort to create another interpretation of the facts, Frank and Carol created a series of stories and transactions in an attempt to avoid the judgment against Frank. First, Carol claims that she purchased the Addison Property. This

---

[8] For example, during Frank's bankruptcy case, Frank forged his ex-wife's name on documents conveying property to Carol. Frank purchased ICS, LLC from James for $500 just days after judgment was entered against James. One day after citations were served on Frank and Carol, Carol transferred the Addison Property to Metrikis Properties.

-13-

claim, however, is quickly dispelled by the fact that Frank signed the purchase agreement and one day later conveyed the Property to Carol. (Pl. Ex. Nos. 6 & 7.)

Second, and most notably, Carol argues that Frank transferred the Property to Carol in order to repay her for loans that she made to him throughout their marriage. According to Carol, when Frank and Carol obtained the $503,250 loan secured by the mortgage on the Florida Property, Frank gave his proceeds to Carol in order to repay a $135,000 loan she made to him for the ICS, LLC business via the line of credit secured by the Naperville Property, to secure her guaranty on the Fifth Third Bank loan, and to repay the $13,400 credit card debt that was transferred to Carol's credit card. (Def. Mem. Opp. 4-5; Def. Ex. No. 4.)

The Court is in the best position to assess the credibility of the witnesses and weigh the evidence. *See Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that involve credibility of witnesses because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is stated); *Torres v. Wis. Dept. of Health & Social Servs.*, 838 F.2d 944, 946 (7th Cir. 1988) (*citing Anderson*). This Court does not find Carol's story to be credible.[9] Carol and Frank did not sign promissory notes

---

[9] Both Carol and Frank have contradicted themselves throughout the citation proceedings. For example, in earlier proceedings, Frank explained that he did not know who owned Metrikis Properties. (Pl. Ex. No. 3.) Later in the proceedings, it became clear that not only did Frank help create Metrikis Properties, but his wife, Carol, was the owner of Metrikis Properties. (Pl. Ex. Nos. 3, 4, & 12.) By way of further example, Carol claimed that she was never an owner of ICS, Inc. (Pl. Ex. No. 2.) However, Carol represented herself as an owner of ICS, Inc. while applying for loans on behalf of ICS, Inc. (*Id.*) In her citation proceedings, Carol later claimed that she misrepresented herself as an owner in order to help Frank. (*Id.*)

-14-

and did not observe any other usual formalities that evidence a loan. Rather, Carol and Frank attempt to establish the existence of a loan through a homespun pledge of personal property that lists Frank's interest in ICS, the Florida Property, and the Naperville Property to secure this loan. Other than this document, there is no documentation evidencing the indebtedness of Frank to Carol. Moreover, Carol transferred the Addison Property to Metrikis Properties after she was served with the citation, in violation of the citation's injunctive provisions.

Neither the transactions leading up to the purchase of the Florida Property nor the transactions leading up to the purchase of the Addison Property show indebtedness of Frank to Carol. The Florida Property was purchased with $223,525 of Frank's money, $200,000 from a line of credit, and $5,000 in cash from Carol. The line of credit was taken out by both Carol and Frank and was secured by Carol's Naperville Property. Carol's property was used solely as collateral for the line of credit. The Naperville Property was not liquidated and two months after the purchase of the Property, Frank and Carol paid off the line of credit with a loan secured by the Florida Property. Thus, the purchase of the Florida Property did not create a debt due from Frank to Carol.

Throughout 2003, Frank made draws on the line of credit, totaling $125,422, for the use and benefit of ICS, LLC. This line of credit was secured by a mortgage on Carol's Naperville Property. Again, the Naperville Property was used solely as collateral for the line of credit being paid by ICS. The Property was never liquidated to pay for the line of credit. Furthermore, as evidenced by the transactions with Fifth Third Bank, Carol represented

-15-

herself as part owner of ICS,[10] a defendant in this adversary proceeding, and, thus, allowed Frank to draw on the line of credit for the benefit of her company. Therefore, the draws on the line of credit did not create a debt due from Frank to Carol. Similarly, Carol's guaranty of the equipment loan was made at the same time she represented herself as owner of ICS, Inc. Thus, as part owner, Carol guaranteed a loan on behalf of her company. It cannot now be considered a loan to Frank.

The $13,400 credit card transfer arguably could be considered a loan; however, there is no evidence documenting that an actual loan occurred, rather than a gift. It was not included in the homespun pledge of personal property, and there is no evidence of Frank ever making payments to Carol on the loan.

This Court does not find evidence of a loan between Carol and Frank. Furthermore, Carol's story is not a reasonable interpretation of the evidence presented. In order to determine the origination of funds used to purchase the Addison Property, this Court must follow the money. It is undisputed that the funds used to purchase the Addison Property were proceeds of a mortgage loan on the Florida Property jointly owned by Frank and Carol. Furthermore, if one follows the money to the point where Frank and Carol purchased the Florida Property, it is clear that Frank and Carol contributed equally to that Property as well. The funds for the purchase of the Florida Property were partially from proceeds of the sale of the Elmhurst Property, Frank's property, and partially from the proceeds of a loan secured

---

[10] Carol argues that she is not an owner of ICS, Inc. that she was misrepresenting herself to the bank as owner in order to help Frank. The marital settlement agreement, however, releases Carol from all interest in ICS, Inc. suggesting that Carol had an interest to release. (Def. Ex. No. 7 at Article 5.)

-16-

by a mortgage on the Naperville Property, Carol's property. The funds obtained through the loan secured by Carol's property and her own cash nearly equals the funds produced by the sale of Frank's Elmhurst Property. Thus, Carol and Frank contributed an equal share to the purchase of the Addison Property.

In examining the evidence in light of the guidelines set forth above, the Court finds that the circumstances needed to impose a resulting trust are present in this matter. This is a situation where the husband alone entered into a contract to purchase the Addison Property for an agreed upon sum, in which Frank contributed fifty percent of the funds used to purchase the Property. Other factors that indicate an intent to retain a beneficial interest in the property being nominally held by Metrikis Properties include: The husband conveyed the Property to Carol for no consideration, agreed to pay the taxes, occupied the building before and after the conveyance (Pl. Ex. Nos. 3-5), and created and paid for the holding company that would eventually hold title to the Property. The totality of the evidence establishes that the Property was conveyed for the purpose of avoiding the Trustee and creditors, while still allowing Frank to benefit from the use of the Property. This Court concludes that the Trustee met his clear and convincing burden. A resulting trust in one-half of the Addison Property arose in favor of Frank at the time of conveyance on September 29, 2004.

Judgment was entered against Frank and ICS, Inc. on April 27, 2005, and citations were served upon Frank and Carol on May 25, 2005. After they were served citations, Frank and Carol filed and obtained a judgment for dissolution of their marriage. The property settlement agreement recites that Frank owes Carol $135,000 from the line of credit and that Frank is releasing any interest in the Florida Property. It also recites that Carol purchased

-17-

the Addison Property with her non-marital assets. As noted above, however, the evidence supports the imposition of a resulting trust on the Addison Property. Furthermore, actions of the parties subsequent to the vesting of title have little effect on the issue of trust, except as to show the original intent of the parties. *Hocking*, 394 N.E.2d at 657. Subsequent declarations or admissions of the parties bear even less evidentiary weight than their actions. *Id.* The resulting trust arose nearly a year before the property settlement agreement. Therefore, because the resulting trust arose and vested at the time of conveyance, it is to be given full effect in these proceedings. For the foregoing reasons, a resulting trust in one-half of the Addison Property arose in favor of Frank and is subject to the enforcement of the judgment.

### IV. CONCLUSION

For the foregoing reasons, the Court grants the Trustee's motion to enforce the judgment and finds that a resulting trust in one-half of the Addison Property arose in favor of Frank and is subject to the enforcement of the judgment.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED:**

DATE: 11/8/6

John H. Squires
**United States Bankruptcy Judge**

cc: See attached Service List

## SERVICE LIST

**David R. Brown, Trustee v. Frank Szabo, Jr., Infrastructure Construction Services, LLC and Infrastructure Construction Services, Inc.**

Adversary No. 04 A 03446

David G. Lynch, Esq.
David N. Missner, Esq.
DLA Piper Rudnick Gray Cary USLLP
203 N. LaSalle St., Suite 1800
Chicago, IL 60601-1293

Gregory J. Jordan, Esq.
Peter J. Schmidt, Esq.
Dykema, Gossett, Rooks, Pitts PLLC
10 S. Wacker Drive, Suite 2300
Chicago, IL 60606

Sarah E. Cook, Esq.
William S. Piper, Esq.
McKenna Storer
33 N. LaSalle Street, Suite 1400
Chicago, IL 60603-2610

William T. Neary, United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606